Rehearing en banc granted by order
filed 12/16/02; opinion filed 10/10/02
is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

---

LISA L. OCHELTREE,
    *Plaintiff-Appellee,*

v.                  No. 01-1648

SCOLLON PRODUCTIONS,
INCORPORATED,
    *Defendant-Appellant.*

---

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Senior District Judge.
(CA-96-1215)

Argued: April 2, 2002

Decided: October 10, 2002

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

---

Reversed and remanded with instructions by published opinion. Judge
Williams wrote the opinion, in which Judge Niemeyer joined. Judge
Michael wrote an opinion dissenting in part and concurring in the
judgment in part.

---

**COUNSEL**

**ARGUED:** Charles Franklin Thompson, Jr., TALLEY, MALONE,
THOMPSON & GREGORY, Columbia, South Carolina, for Appel-
lant. William Elvin Hopkins, Jr., MCCUTCHEN, BLANTON,
RHODES & JOHNSON, L.L.P., Columbia, South Carolina, for

Appellee. **ON BRIEF:** Michael D. Malone, TALLEY, MALONE, THOMPSON & GREGORY, Columbia, South Carolina, for Appellant.

---

**OPINION**

WILLIAMS, Circuit Judge:

Lisa L. Ocheltree filed this action against her employer, Scollon Productions, Incorporated (Scollon Productions), alleging sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e (West 1994 & Supp. 2001). Following a jury trial, Ocheltree was awarded a substantial amount in compensatory and punitive damages. Scollon Productions appeals the district court's denial of its motion for judgment as a matter of law. Because we agree that "there is no legally sufficient evidentiary basis" for the jury's verdict, Fed. R. Civ. P. 50(a)(1), we reverse and remand with instructions for the district court to enter judgment in favor of Scollon Productions.

I.

A.

Scollon Productions is in the business of creating costumes for various characters and mascots, such as the South Carolina Gamecock mascot.[1] Bill Scollon (Scollon) began the company 31 years ago and is the President, and Ellery Locklear is the Vice-President. The company currently employs approximately 50 people and is operated from a plant that is located in White Rock, South Carolina. Ocheltree was employed in the production shop of the plant from February 1994 until her discharge in August 1995.

Ocheltree testified to numerous incidents of offensive behavior

---

[1] As an appeal from the denial of judgment as a matter of law, we view the facts and any inferences in the light most favorable to Ocheltree, the non-moving party.

during her employment at Scollon Productions. According to Ocheltree, some of the primarily male staff engaged in open conversations about sex, made comments about the sexual habits of others on the staff, used foul, vulgar, and profane language, and told sexually-oriented jokes. Ocheltree also testified about specific incidents that occurred during her employment, including an incident when she witnessed employees pretending to perform oral sex and other sexual acts on a mannequin, another incident when employees showed Ocheltree a picture of pierced male genitalia and asked her what she thought about it, and finally, an incident when a co-worker sang her a song in which the lyrics were "come to me, oh baby, come to me, your breath smells like cum to me." (J.A. at 114-15.) According to Ocheltree's testimony, the shop supervisor, Harold Hirsch, showed a photograph of a nude woman around the shop and engaged in several sexually explicit conversations with Ocheltree's male coworkers.

Brian Hodge, a former employee of Scollon Productions, corroborated portions of Ocheltree's testimony, stating that there was a good deal of "vulgar language and vulgar attitude throughout the shop," and that this type of conduct happened "every day." (J.A. at 199-200, 204.) He also testified to overhearing employees discuss sexual acts and witnessed employees simulate sexually explicit acts on mannequins. Hodge stated that Hirsch was often present during these discussions and conduct, had participated in some of the discussions, and had once made a sexually explicit comment. Hodge testified that he recalled a safety meeting attended by Hirsch wherein Ocheltree let it be known that she was offended by the conduct and that she wanted the language and the conduct to stop immediately. Hodge testified that he "speculated" that the men engaged in some of the behavior to "bother[ ]" Ocheltree, and that the behavior got worse after Ocheltree complained. (J.A. at 202-03.)

According to Ocheltree, she attempted to speak to Scollon and Locklear about the work environment on different occasions, but she was never given the opportunity to meet with either. On at least one occasion, Scollon told her that he did not have time to meet with her and instructed her to speak to Locklear. On another occasion, when Locklear was on the telephone, Ocheltree wrote him a note stating that she needed to speak with him, but she did not indicate what she

3

needed to speak with him about. Locklear testified that after he concluded his conversation, he attempted to speak to Ocheltree about the note, but he could not find her because she was not at her work station. He made no further attempts to follow up with her; nor did Ocheltree make any further attempts to speak with Locklear or Scollon. In 1995, after approximately 18 months with Scollon Productions, Ocheltree was discharged for excessive absenteeism, excessive use of the telephone during working hours, and because her husband had threatened physical violence against Locklear.

B.

On April 25, 1996, Ocheltree filed a complaint against Scollon Productions in the United States District Court of South Carolina, alleging sexual harassment and violations of South Carolina state law. Following a report and recommendation by a magistrate judge, the district court granted Scollon Productions's motion for summary judgment on all claims. In his report and recommendation, the magistrate judge found that there was no basis for imposing liability on Scollon Productions because neither Scollon nor Locklear, who were the only two members of the corporation active in day-to-day management, were aware of or should have known of the offending activity. The district court concluded that Ocheltree failed to object to the finding that neither Scollon nor Locklear knew of the offending activity, adopted the magistrate judge's recommendation, and granted summary judgment to Scollon Productions. Ocheltree filed a pro se appeal with this court.

Following briefing on the appeal, the Supreme Court issued its opinions in *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), which held that an employer is vicariously liable for a hostile work environment created by a supervisor, subject to an affirmative defense that allows the employer to avoid strict liability for one employee's sexual harassment of another.[2] *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765.

---

[2] To be entitled to the affirmative defense, the employer must first show that no adverse tangible employment action was taken. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. If this preliminary requirement

Based upon *Faragher* and *Ellerth*, we vacated the district court's judgment as to the hostile work environment claim and remanded. *Ocheltree v. Scollon*, 161 F.3d 3, 1998 WL 482783 (4th Cir. Aug. 11, 1998). We affirmed the district court's dismissal of Ocheltree's state law claims because Ocheltree failed to preserve those issues on appeal. *Id.*

Upon remand, Scollon Productions filed three separate motions for summary judgment, each of which was denied by the district court. After the jury returned a special verdict in favor of Ocheltree for $7,280.00 in compensatory damages and $400,000 in punitive damages, Scollon Productions filed a motion for judgment as a matter of law, requesting the district court to set aside the jury verdict, or, in the alternative to reduce the damages award based upon the statutory cap on punitive and compensatory damages in 42 U.S.C.A. § 1981a(b)(3) (West 1994 & Supp. 2001). The district court denied the motion to set aside the jury verdict but reduced the punitive and compensatory damages award to a total of $50,000 pursuant to § 1981a(b)(3)(A). Scollon Productions filed a timely notice of appeal.

## II.

We review de novo a district court's denial of a Rule 50 motion for judgment as a matter of law, viewing the evidence in the light most favorable to the non-moving party. *See, e.g.*, *Chaudhry v. Gallerizzo*, 174 F.3d 394, 404-05 (4th Cir. 1999). A court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. Proc. 50(a); *see also* *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000). "While we are compelled to accord the utmost respect to jury verdicts and tread gin-

---

is met, then the company must prove that it exercised reasonable care in preventing and promptly correcting any sexually harassing behavior. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. It also must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

5

gerly in reviewing them, we are not a rubber stamp convened merely to endorse the conclusions of the jury, but rather have a duty to reverse the jury verdict[ ] if the evidence cannot support it." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996) (internal citations omitted). "Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Id.* at 1249 (internal quotation marks omitted).

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1). Because the workplace environment is one of the "terms, conditions, or privileges of employment," *see Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64-67 (1986), Title VII creates a cause of action in favor of persons forced to work in a hostile workplace, *see id.* at 66 (establishing "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment"). To establish sexual harassment based upon a hostile or abusive work environment, a plaintiff is required to prove four elements: "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Virginia*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc); *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999). Scollon Productions contends that the evidence was insufficient with respect to elements (2), (3), and (4). We need only address elements (2) and (3).

## A.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at `discriminat [ion] . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1998). In evaluating the "because of" prong, this court has noted that Title VII was not intended to reach "dirty jokes or sexually-based profanity spoken by a male supervisor to other male employees." *Hopkins v.*

6

*Baltimore Gas & Elec. Co.*, 77 F.3d 745, 749 (4th Cir. 1996). We have further explained "that in prohibiting sex discrimination solely on the basis of whether the employee is a man or a woman, Title VII does not reach discrimination based on other reasons, such as the employee's sexual behavior, prudery, or vulnerability." *Id.* at 751; *see also McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996) (refusing to recognize a Title VII hostile work environment claim for discrimination "`because of' [the harasser's] vulgarity and insensitivity and meanness of spirit"), *abrogated on other grounds by Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75 (1998). As we held in *Hopkins*, the critical issue in evaluating Title VII's "because of" prong is: "[W]ould the complaining employee have suffered the harassment had he or she been of a different gender?" *Hopkins*, 77 F.3d at 750 (quoting *Bundy v. Jackson*, 641 F.2d 934, 942 n.7 (D.C. Cir. 1981)); *cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.").

With respect to the vast majority of offensive conduct upon which Ocheltree relies, the uncontested evidence demonstrates conclusively that Ocheltree would have been exposed to the same atmosphere had she been male. Of the catalogued offensive behavior, only three incidents were directed toward Ocheltree — the vulgar song, the body-piercing magazine, and the sexual acts with the mannequin.[3] The

_____

[3] While Scollon Productions argues that the mannequin incident was not directed at Ocheltree, there was evidence suggesting that it was staged for her benefit and that, after she expressed her disgust, the men began laughing. Thus, drawing all inferences in Ocheltree's favor, we accept that the incident was directed at Ocheltree.

The dissent also points to an incident directed at Ocheltree by Locklear, in which Locklear allegedly stated that Ocheltree should "go home and be a housewife." (J.A. at 129); *post* at 25. The dissent states, "[a] jury could reasonably see this as another piece of evidence suggesting that Ocheltree experienced harassment because of her sex." *Post* at 25. This suggestion is misplaced, in that Ocheltree's Title VII action was based upon alleged harassment by her coworkers in the shop and by Hirsch; she did not claim at trial or on appeal any harassment by Locklear or Scollon

remainder of the conduct occurred in group settings as part of the male workers' daily bantering toward one another and was overheard or witnessed by Ocheltree. *Cf. Hopkins*, 77 F.3d at 754 ("several of the incidents upon which Hopkins relies occurred in group settings"); *White v. Federal Express Corp.*, 939 F.2d 157, 160 (4th Cir. 1991) ("Most of the racist incidents detailed . . . were not directed against plaintiff . . . ."). Moreover, the uncontested evidence demonstrated that the men's behavior did not begin or change as of the date Ocheltree began working with Scollon Productions but had been ongoing before she came to work for Scollon Productions.[4] (J.A. at

---

— Scollon's Vice President and President — and the jury did not find any such harassment. (J.A. at 444) (special verdict form stating "[q]uestions relating ONLY to action of Mrs. Ocheltree's *co-workers in the shop*" (emphasis added)); (J.A. at 446 ("[q]uestions relating ONLY to the Actions of Harold Hirsch"). The dissent states that because Locklear was a corporate officer, his "actions are relevant to the ultimate question of whether Scollon Productions can be held liable to Ocheltree for the creation of a hostile work environment." *Post* at 26 n.3. Whether the subject conduct can be imputed to Scollon Productions, however, is a separate issue from whether Ocheltree experienced harassment because of her sex. In any event, consideration of Locklear's comment would not materially alter our analysis, particularly in light of the context in which the comment was made. Ocheltree testified, "He said, `You always have an excuse, I don't care if someone is dying in your family, you are not to be on the phone and you must be here at work.' He also told me that if I didn't like it there that I ought to go home and be a housewife, that maybe I am not cut out to be here, to be at this job." (J.A. at 129.)

[4] The dissent points to testimony by Hodge and Ocheltree wherein each stated that the atmosphere seemed to become "increasingly coarse" throughout their employment at Scollon Productions. *Post* at 24 & n.2. As the dissent notes, however, Hodge began working at Scollon Productions "several months after Ocheltree began working there," *post* at 24; thus, neither Ocheltree nor Hodge could offer probative evidence regarding the atmosphere at Scollon Productions prior to Ocheltree's employment. Additionally, insofar as Hodge's and Ocheltree's testimony supports a finding that the atmosphere at Scollon Productions became more crude during Ocheltree's employment than it was as of the date she was hired there is no evidence, however, that the behavior worsened or became more crude because of Ocheltree's gender. *See infra* at 11. Without such evidence, the simple fact that the behavior worsened cannot support the jury's verdict.

241-42); *cf. Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (court may consider "the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs" (internal quotation marks omitted)).

Additionally, setting aside the incidents involving the mannequin and the vulgar song, there was no evidence demonstrating that the offensive behavior that occurred in Ocheltree's presence was gender-related. The discussions certainly were sexually explicit, including the discussion regarding the body-piercing magazine, and while they were generally degrading, humiliating, and even insulting, they were not aimed solely at females in any way. *Compare Oncale*, 523 U.S. at 80 ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *Lack v. Wal-Mart, Inc.*, 240 F.3d 255, 258 (4th Cir. 2001) (overturning a jury verdict for lack of evidence supporting the "because of" prong where the supervisor regularly told sexually explicit jokes, used sexually vulgar language, and generally had an "unabashed taste for lewd humor"), *with Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) ("A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances."). Ocheltree conceded that the conduct was equally offensive both to men and women. Two of Ocheltree's male coworkers, Steve Zouras and John Riddle, complained to management about the other workers' behavior. *Cf. Lack*, 240 F.3d at 262 ("Lack fails to come to grips with the fact that female employees (including his original co-plaintiff Susan Willis) also lodged similar complaints regarding Bragg's behavior. This fact undercuts Lack's claim to a substantial extent."); *id.* ("In its totality, the evidence compels the conclusion that Bragg was just an indiscriminately vulgar and offensive supervisor, obnoxious to men and women alike."). Ocheltree testified that there was never any suggestion that she engage in sexual relations with anyone at the plant, that she was not frightened by any of the behavior, that nobody touched her in a sexual or threatening manner, and that none of the comments were related in any manner to her appearance. (J.A. at 147); *cf. Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 773 (4th Cir.

9

1997) ("There is no allegation that Hartsell was inappropriately touched, propositioned, flirted with, taunted, or even ogled."). Also of significance is the fact that the vulgarities alleged here, including "mother f----r," "faggot," "d--k head," "p-ssy," "blow job," and "ass," (J.A. at 35-36), are not "unambiguous [gender] epithet[s]," *Spriggs v. Diamond Auto Glass, Inc.*, 242 F.3d 179, 185 (4th Cir. 2001), such that it would be reasonable to assume that they were animated by gender bias.[5] The dissent disputes this final point, claiming that many of the sexually-explicit conversations portray women as "sexually subordinate" to men. *Post* at 28. We cannot agree that the evidence supports such a characterization; the conversations simply depict— in graphic and crude terms — heterosexual sex, including oral sex. Indeed, the conversations depict the sexual prowess of females at least to the same extent as they do males.

To demonstrate that the harassment was directed at her because of her gender, Ocheltree relies upon the testimony of Hodge, in which he stated that he believed the men acted the way they did to "bother" Ocheltree. (J.A. at 202.) Hodge conceded, however, that his testimony regarding the motivation for the conduct was pure speculation.[6] Additionally, even if the alleged harassers were intending to bother Ocheltree, there is no evidence that those participating in the offensive conduct were attempting to bother her *because of her gender*. On the evidence presented, the jury would not be permitted to make the inferential leap that Ocheltree's gender motivated the men's offensive behavior. As noted above, the uncontroverted evidence demonstrated that the men engaged in the same type of behavior before Ocheltree

---

[5] The fact that some of the vulgarities are profane references to each gender's various body parts does not render them inherently abusive or disparaging on account of gender. If that were true, sexually explicit conversations involving obscene terms would invariably constitute gender-related discrimination, a result that we have rejected. *Lack v. Wal-Mart, Inc.*, 240 F.3d 255, 262 n.8 (4th Cir. 2001) ("Facially sexual remarks must be evaluated according to their common usage—however vulgar the usage may be.").

[6] In concluding that Hodge testified to a permissible "inference" instead of objectionable speculation, *post* at 29 n.4, the dissent conveniently ignores the precise language used by Hodge. (J.A. at 202 ("Now, that is just speculation . . . .").)

10

began working at Scollon Productions, continued to engage in the behavior around the other men while Ocheltree worked there, and that several other men found the behavior equally offensive.

Hodge also testified that the behavior worsened after Ocheltree complained about the behavior at a meeting, which Ocheltree contends is evidence that the sexually explicit behavior was motivated by gender. Notably lacking, however, was evidence demonstrating that after Ocheltree complained, the offensive behavior worsened only toward her, as opposed to worsening toward all employees. Indeed, from Hodge's testimony, one can only conclude that the behavior worsened for all employees and was equally offensive to men and women alike. Accordingly, giving Ocheltree the benefit of all permissible inferences, none of the offensive behavior catalogued by Ocheltree was directed at her because of her gender, save the vulgar song and the simulated sex with the mannequin, which arguably could be construed as gender-related harassment, in that both could be perceived as particularly demeaning towards women or as veiled sexual propositions. Assuming, without deciding, that these two incidents constitute gender-related harassment, we next consider whether the incidents were so severe or pervasive as to have altered the terms of Ocheltree's employment.

### B.

In analyzing the third element of a hostile work environment claim, this court has emphasized that "[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable." *Hartsell*, 123 F.3d at 772 (internal quotation marks omitted). "The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (internal quotation marks and citation omitted).

When presented in other Title VII cases with the type of isolated, scattered incidents that are at issue here, we repeatedly have held that the conduct was not sufficiently severe or pervasive as a matter of law. *See, e.g.*, *Hartsell*, 123 F.3d at 773 ("But the claims propounded by Hartsell — even assuming them all to be true — are so trivial, so

11

isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate."); *Hopkins*, 77 F.3d at 754 (listing cases involving infrequent, isolated incidents in which we have held that harassment was not severe or pervasive as a matter of law). Thus, we have no difficulty concluding that the two arguably gender-related incidents directed at Ocheltree during the year and a half that she was employed at Scollon Productions were not severe or pervasive for purposes of Title VII. Having failed to introduce sufficient evidence establishing the third element of Ocheltree's hostile work environment claim, the claim is not cognizable as a matter of law. Accordingly, the district court erred by refusing to grant judgment as a matter of law in favor of Scollon Productions.[7]

C.

The dissent agrees that the gender-based conduct identified in Part A is insufficient, as a matter of law, to create a hostile or abusive work environment under this circuit's jurisprudence. *Post* at 22. The dissent further agrees "that much of the sexual talk Ocheltree heard — vulgar though it may be — cannot be seen as disproportionately demeaning to women." *Post* at 33-34. The dissent concludes, however, that "Ocheltree's coworkers' constant descriptions of their sexual exploits, including their near-obsessive interest in discussions of oral sex," *post* at 34, constitute gender-based harassment and that, upon considering these conversations, the evidence was sufficient to support the jury's verdict. In so concluding, the dissent relies principally upon the shock value of the salacious conduct.[8] However well-

---

[7] Because we conclude that the gender-based conduct was not sufficiently severe or pervasive for Ocheltree to establish a prima facie case of sexual harassment under Title VII, we do not reach the questions of whether the conduct could be imputed to Scollon Productions or whether Scollon Productions is entitled to operation of the *Faragher/Ellerth* affirmative defense. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

[8] The dissent states that a detailed recitation of every aspect of the crude and offensive behavior that took place at Scollon is necessary to a proper analysis. *Post* at 23. It then goes on, however, to conclude that "much of" the detailed behavior cannot be viewed as gender-based discrimination in this case. *Post* at 33. Thus, one questions whether the detailed description genuinely is required for a proper legal analysis.

12

intentioned the dissent's analysis may be, it ignores or substantially discounts controlling circuit and Supreme Court Title VII jurisprudence and relies upon a number of flawed premises, warranting a somewhat extended response.

The crux of the dissent's analysis relies on the premise that "[c]ourts have . . . recognized that harassing conduct can be `because of sex' even when the conduct `is not directed at a particular individual or group of individuals, but is disproportionately more offensive or demeaning to one sex.'" *Post* at 31 (quoting *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991)). It then states that a Title VII plaintiff can demonstrate that conduct is gender-based by showing that the "environment was more hostile to her because of her sex than it would have been to a man." *Post* at 32. Despite the dissent's protestations to the contrary, such an analytical framework defines "discriminat[ion] . . . because of . . . sex" exclusively by reference to the potential unintended effects of offensive conduct on a particular gender, without regard to the motivation for, or intent underlying, the offensive conduct.[9] Whatever merit this approach might have, it is diametrically opposed to the construction that has been given to the phrase "discriminat [ion] . . . because of . . . sex" throughout Title VII sexual harassment jurisprudence.[10] *Oncale*,

---

[9] Title VII prohibits intentional sex discrimination as well as discrimination that has a disparate impact on a particular sex. Sexual harassment is a "distinct . . . form" of intentional sex discrimination. *DeClue v. Central Illinois Light Co.*, 223 F.3d 434, 437 (7th Cir. 2001); *see also Ellerth*, 524 U.S. at 756 ("Sexual harassment under Title VII presupposes intentional conduct."). Ocheltree litigated this case only as a sexual harassment case and not as a disparate impact case. *DeClue*, 223 F.3d at 437; *supra* at 4.

[10] By misapprehending the nature of the "discriminat[ion] . . . because of . . . sex" inquiry, the dissent incorrectly assumes that the question of whether Ocheltree "would have been exposed to the same atmosphere had she been male" is somehow distinct from the question of "`whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Post* at 32 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). As the above-cited cases make clear, however, there is no material difference between the two questions; once the

13

523 U.S. at 79, 80 (examining the question of what "discriminat[ion] . . . because of . . . sex" means and focusing on the harasser's motivation for the offensive conduct, and thus reaffirming that the critical issue is discriminatory intent); *Lack*, 240 F.3d at 261 (asking whether offensive comments were "animated by Bragg's hostility to Lack as a man"); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) ("An employee is harassed or otherwise discriminated against `because of' his or her gender if, `but for' the employee's gender, he or she would not have been the victim of the discrimination." (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)); *Succar v. Dade Co. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) (reiterating that harassment is "because of" gender only when the harassment is *motivated by* gender); *Green v. Administrators of the Tulane Educ. Fund*, 284 F.3d 642, 659 (5th Cir. 2002) (approving a jury instruction that stated that jury must find that gender was the "but for" cause of the harassing conduct); *Williams v. General Motors, Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (ruling that a plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment" (citation omitted)); *see also DeClue v. Central Illinois Light Co.*, 223 F.3d 434, 437 (7th Cir. 2001) (discussing distinction between sexual harassment hostile work environment claim and a sexual discrimination disparate impact claim); *Gillming v. Simmons Indus.*, 91 F.3d 1168, 1171-72 (8th Cir. 1996) (affirming a jury instruction that required the jury to find that the harassing acts

---

former has been answered in the negative, the latter necessarily also has been answered in the negative. *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) ("An employee is harassed or otherwise discriminated against `because of' his or her sex if, `but-for' the employee's sex, he or she would not have been the victim of the discrimination."); *Hopkins*, 77 F.3d at 750 (opinion of Niemeyer, J.) (citing *Bundy v. Jackson*, 641 F.2d 934, 942 n.7 (D.C. Cir. 1981) ("the question is one of but-for causation: would the complaining employee have suffered the harassment had he or she been of a different gender")). Nor can we accept credit for "commit[ting] this court to a course" that focuses on the alleged harasser's motivations rather than the unintended consequences of his actions. *Post* at 36. To the contrary, this course long ago was set out by the Supreme Court and prior panels of this court, and it is our duty to apply the well-established analytical framework to the facts before us, regardless of how unsavory those facts may be.

14

were intentional and motivated by gender); EEOC Comp. Manual (CCH) §615.2(b)(3) (1987) ("[T]he crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex."); *see generally* David S. Schwartz, *When is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. Pa. L. Rev. 1697, 1772-74 (2002) (concluding that use of an "effects" test or a disparate impact test, as opposed to a motivation test, is improper when evaluating a sexual harassment claim).

Moreover, the dissent fails to explain persuasively how its analysis comports with that set forth in *Lack*, wherein we explicitly rejected the argument that sexually explicit jokes and sexually vulgar language directed at, and offensive to, both genders constitute discrimination because of sex. *Lack*, 240 F.3d at 258 (addressing a set of sexually vulgar remarks comparable to the type and number of those at issue here); *see also Hopkins*, 77 F.3d at 749 (stating that Title VII does not reach "dirty jokes or sexually-based profanity spoken by a male supervisor to other male employees."). In so holding, we relied on the fact that Lack had not introduced *any* evidence, comparative or otherwise, of gender-based discrimination. *Lack*, 240 F.3d at 262 ("Lack, however, failed to offer such evidence — or any other basis for a jury to conclude that Bragg's conduct was not just sexually tinged harassment, but was instead harassment because of sex."). Accordingly, far from being "a logical extension" of Title VII principles, the dissent's analysis sharply diverges from well established case law in the Supreme Court and in virtually every circuit, including this one.

We do not dispute, of course, that sexually explicit banter can, in some circumstances, constitute gender-based discrimination, but the inquiry is always whether "but for" the plaintiff's gender, the harassment would not have occurred — not whether "but for" the plaintiff's gender, she would have felt discriminated against, irrespective of the harasser's motivation. Ocheltree has presented no legally sufficient evidence demonstrating that her gender motivated the men's sexually explicit conduct and conversations (save, perhaps, the mannequin and vulgar song incidents discussed above, *supra* at 9); i.e., no evidence demonstrating that she would not have been exposed to the same offensive behavior had she been male. Thus, she has not proven that

15

the sexually explicit behavior upon which the dissent relies constitutes gender-based discrimination.[11]

The dissent's contrary conclusion is premised not only upon an improper analytical framework but also upon an overly rigid view regarding the significance of the fact that the offensive discussions were sexual in content. The dissent would have us adopt a rule that conversations between males about their heterosexual activities in the presence of a female virtually always constitute sex-based harassment because, according to the dissent's characterization, these conversations depict women as "sexually subordinate to men."[12] As the Court

---

[11] To the extent the dissent would have us rely exclusively on the effects of the offensive behavior that took place at Scollon Productions, it notably avoids discussing the lack of any allegation or evidence that Ocheltree's work or productivity was affected negatively by the conduct or that Ocheltree ever sought to be transferred to another area of Scollon Productions where other women worked. In fact, she testified that, even with consideration of the offensive conduct, she "loved" her job. (J.A. at 114.)

Also significant to any "effects" inquiry is Ocheltree's failure to mention the ongoing harassment to Scollon or Locklear, particularly in light of her previous experience involving a complaint about offensive behavior. In June 1994, shortly after Ocheltree was hired, Steve Zouras, one of Ocheltree's coworkers, reported to Scollon that another employee had told a sexually explicit joke to Ocheltree and that she was offended by the joke. Locklear asked Ocheltree about the incident, and she confirmed it. The offending employee immediately was fired. Ocheltree acknowledged that, from Scollon and Locklear's handling of this complaint, she was aware that Scollon or Locklear would redress her grievance if notified of the behavior. Ocheltree testified that she saw Scollon once a week in the production shop and Locklear more than once a week. Yet, Ocheltree never notified either that the offensive behavior was continuing or worsening. *Supra* at 3-4 (noting that Ocheltree indicated a desire to speak with Scollon and Locklear but never informed either about the nature of her complaint).

[12] The dissent asserts that it does not suggest that conversations about heterosexual behavior are automatically demeaning to women but that the "tone" and "tenor" of the conversations must be evaluated to determine whether gender-based discrimination exists. Nevertheless, it cites only the frequency and the sexual content of the conversations in support

16

stated in *Oncale*, however, "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80; *see also id.* at 81 ("[Title VII] does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."). Rather, the motivation for the harassment must be evaluated in light of "the social context in which particular behavior occurs and is experienced by its target." *Id.* at 81. Here, an examination of the relevant context involves an acknowledgment that the offensive conduct took place in a costume production shop where public access is controlled, not a church office, retail shop, bank, or professional office.[13] In fact, were we to adopt the dissent's rhetoric and hold that harassment inevitably is because of sex whenever "a workplace is suffused with representations of women as sexual objects," one wonders how any business that deals routinely with sexually explicit content would escape Title VII liability.

Also incorrect is the assumption pervading the dissent that women are more insulted and demeaned by sexual banter about heterosexual sex, and particularly discussions of oral sex, than are men.[14] This

---

of its conclusion that many of the discussions that took place at Scollon Productions constituted gender-based harassment. *Post* at 34. The dissent seems to suggest a rule whereby a reviewing court would affirm a finding of gender-based discrimination once a certain number of conversations about heterosexual behavior occur in the workplace in the presence of a female. Thus, Title VII would become a workplace code for "gentlemanly conduct" in the presence of women.

[13] This fact is significant to a proper contextual analysis because in an environment, like the production shop where public access is controlled offensive behavior among the workers may be more prevalent than it otherwise would be in an environment easily accessible by the public. We do not hold or intimate, as the dissent suggests, that "women in blue collar jobs must put up with conduct that women who work in banks or professional offices need not tolerate." *Post* at 39 n.8.

[14] The dissent also fails to explain why, if women are inevitably demeaned by conversations about heterosexual sex, men would not have felt equally demeaned or harassed by the graphic conversations about homosexual sex that took place at Scollon Productions.

17

assumption is paternalistic and contrary to Title VII itself. The Fifth Circuit has cautioned against formulating Title VII jurisprudence against the backdrop of such outdated stereotypes, stating:

> A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace. Any lesser standard of liability, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality. In fact, a less onerous standard of liability would attempt to insulate women from everyday insults as if they remained models of Victorian reticence. A lesser standard of liability would mandate not equality but preference for women: it would create incentives for employers to bend over backwards in women's favor for fear of lawsuits. Now that most American women are working outside the home, in a broad range of occupations and with ever-increasing responsibility, it seems perverse to claim that they need the protection of a preferential standard. The careful, heightened phrasing of a hostile environment claim, enforceable where working conditions have palpably deteriorated because of sexually hostile conduct, aims to enforce equality, not preference.

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995). Similarly, feminist literature recognizes that eliminating sexual content in the workplace is not a viable or valuable goal of hostile work environment jurisprudence and that working women can be, and usually are, as comfortable as are men with sexually explicit conduct and conversations. Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1794 (1998) ("Sexuality should not be conceptualized solely as a sphere of gender domination, but also as a potential arena of women's empowerment."); *id.* at 1791-92 ("[F]eminism receives a bad rap when workers are fired in the name of a feminist-inspired cause of action for merely talking about sex . . . . [S]uch firings may sow the seeds of backlash against protecting women from genuinely harmful forms of hostile work environment harassment."); Barbara Gutek, *Sex and the Workplace: The*

18

*Impact of Sexual Behavior and Harassment on Women, Men, and Organizations* 143 tbl.2 (1985) (showing that, even though 28% of a random sample of women working in male-dominated workplaces experienced frequent sexual talk or joking, a very minor percentage of those sampled considered sexual harassment to be a major problem at work); Ellen Carol DuBois & Linda Gordon, *Seeking Ecstasy on the Battlefield: Danger and Pleasure in Nineteenth-Century Feminist Sexual Thought*, in *Pleasure and Danger: Exploring Female Sexuality* 31, 32-39 (Carol S. Vance ed., Pandora Press 1992) (discussing how 19th-century "social purity" feminists' emphasis on sexuality as a realm of danger and oppression for women replicated sexist and classist tendencies within wider society to separate women into those deserving of protection and those deserving of condemnation); *cf.* Carlin Meyer, *Sex, Sin and Women's Liberation*, 72 Tex. L. Rev. 1097, 1119-20 (1994) (noting that, in the context of pornography regulation, "[j]udges, juries, and most members of the public are likely to find most explicit and `deviant' sexual depictions repell[e]nt and view as degrading not only sexual portrayals that descriptively, humorously, playfully, or ironically depict subordinated women, but also those that are explicitly intended to challenge that subordination").

Because we view all facts and inferences in favor of Ocheltree, we have not relied on evidence regarding Ocheltree's participation in the offensive conduct, which, for the most part, she generally denied, to evaluate the sufficiency of the evidence to support the jury's verdict. Nevertheless, to place in context the dissent's description of the environment at Scollon Productions, we note there is substantial evidence that Ocheltree does not fit the dissent's model of femininity. Several witnesses testified that they heard Ocheltree talk about her "pet name" for her husband's penis and other sexual matters. (J.A. at 239-40, 278.) These witnesses also testified that Ocheltree brought a picture of herself to work in which she was dressed in a bikini and asked a co-worker if he thought it was sexy. One coworker testified that Ocheltree brought a picture into work of a wall upon which her husband had written her name in urine. The coworker also testified about an occasion when two other workers were discussing whether to "use six or eight inch domes" to construct the head of one of the costumes, and Ocheltree "volunteer[ed] that she was not interested in six or eight inches because she had twelve inches waiting for her at home."

(J.A. at 240, 343.) With respect to the body-piercing book, a coworker testified that Ocheltree voluntarily looked at the book "by herself" while on break.[15] (J.A. at 343.) This evidence would suggest that Ocheltree was not any more sensitive to vulgarity than some of her male counterparts. Thus, in concluding that "a reasonable woman" would be more offended and demeaned by sexually explicit conversations than a man, the dissent adopts the very stereotypes that Title VII was designed to eradicate.

In sum, the dissent misapprehends the controlling law, ignores the context in which the offensive behavior took place, and attempts to transmute Title VII into a neo-Victorian chivalry code designed to protect what the dissent imagines to be the tender sensitivities of contemporary women. Such a requirement of preferential and paternalistic treatment would be a strange interpretation of statutory language that demands equality. For the above-stated reasons, we are constrained to reject the dissent's overly broad conception of when harassment constitutes "discriminat[ion] . . . because of . . . sex" in a hostile work environment claim.

### D.

Finally, in response to the dissent's repeated assertions that we have not given proper deference to the jury's verdict, it bears mention that the jury should not have been given the opportunity to consider Ocheltree's claim because, as a matter of law, the evidence of sexual harassment was insufficient to submit the claim to the jury. The fact that the claim was improperly submitted to the jury does not allow us, as the dissent suggests, to affirm the jury's verdict on the basis of evidence that is legally insufficient to support the verdict. Our holding in this regard is neither novel nor exceptional; we consistently have granted judgment as a matter of law when presented in other Title VII cases with conduct of the type alleged by Ocheltree. *See, e.g.*, *Lack*, 240 F.3d at 258, 262 (overturning a jury verdict on similar evidence presented here); *Hartsell*, 123 F.3d at 768-69, 772-73 (concluding that

---

[15] Ocheltree testified that she told her husband about the offensive conduct, and he told her "well, it is a male atmosphere, just suck it up." (J.A. at 114, 154.) She also testified that she used the "f——" word, but not "in a sexual way." (J.A. at 130.)

Hartsell was not entitled to proceed to trial when coworker referred to Hartsell as a "mini-van driving mommy," and made comments such as "[W]hy don't you go home and fetch your husband's slippers like a good little wife, that's exactly what my wife is going to do for me," and "We've made every female in this office cry like a baby. We will do the same to you."); *Dwyer v. Smith*, 867 F.2d 184, 187-88 (4th Cir. 1989) (affirming directed verdict in Title VII case despite evidence that female police officer was subjected to pornographic material placed in her station mailbox and to fellow officers' sexually explicit conversations); *Hopkins*, 77 F.3d at 751 (noting that "because of . . . sex in Title VII does not mean because of the victim's . . . vulnerability to sexually-focused speech or conduct" (internal quotation marks omitted)); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women . . . . It is not designed to purge the workplace of vulgarity."). To the extent the dissent would have us employ a more lenient standard due to the extremely distasteful nature of the facts of this case, we agree that there exists "a profound difference in our respective approaches to reviewing a jury verdict." *Post* at 42.

### III.

Regardless of how repulsive we find the behavior to have been during and before Ocheltree's employment with Scollon Productions, we are compelled to conclude that the conduct does not give rise to an actionable claim for sexual harassment under Title VII. As we stated in *Hopkins*: "While we do not approve of [the plaintiff's co-worker's] apparent willingness to offend and provoke employees with his ambiguously sexual innuendoes, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace . . . ." *Hopkins*, 77 F.3d at 754. "There perhaps `ought to be a law against' . . . puerile and repulsive workplace behavior . . . in order to protect the victims against its indignities and debilitations, but . . . Title VII is not that law." *Id.* at 752 (quoting *McWilliams*, 72 F.3d at 1196). "Ultimately . . . our role as courts is limited to faithfully interpreting the statutes enacted by the Congress and signed into law by the President," *Wrightson*, 99 F.3d at 144, and Title VII was not enacted as a workplace code for "gentlemanly conduct" or chivalry.

21

Thus, we conclude that the district court erred by denying Scollon Productions's motion for judgment as a matter of law, and we reverse and remand for the district court to enter judgment in favor of Scollon Productions.[16]

*REVERSED AND REMANDED WITH INSTRUCTIONS*

MICHAEL, Circuit Judge, dissenting in part and concurring in the judgment in part:

Over the objections of Lisa Ocheltree's counsel, the district court directed a jury of four men and four women to answer a detailed set of special interrogatories about Ocheltree's sexual harassment claim against Scollon Productions, Inc. The jury answered every question in Ocheltree's favor and awarded her compensatory damages of $7,280 and punitive damages of $400,000. (The district court later reduced the punitive damages to $42,720, bringing the total judgment against the company in line with the $50,000 cap imposed by 42 U.S.C. § 1981a(b)(3)(A).) Today, the majority reverses the entire judgment. It concludes that Ocheltree suffered (at most) only two incidents of harassment that were sex based: the vulgar song and the incident when Ocheltree's coworker performed simulated oral sex on a mannequin. It then concludes that, as a matter of law, these two incidents spaced over the eighteen-month period when Ocheltree worked at Scollon Productions were insufficient to create a hostile or abusive work environment. I agree that, under our precedents, the jury's verdict could not stand if the two incidents identified by the majority were the only evidence of sex-based harassment in the record. I believe, however, that the majority's conclusion rests on both an overly narrow conception of when harassment is "because of sex" and a failure to read the trial evidence in the light most favorable to Ocheltree. I would uphold the jury's decision that Ocheltree was subjected to a hostile work environment because of her sex. Because I would also hold that Scollon Productions had constructive knowledge of the harassment and failed to take effective remedial action,

---

[16] Insofar as we conclude that Ocheltree failed to establish the essential elements of a sexual harassment claim, we likewise reverse the district court's denial of Scollon Productions's motion to set aside the jury's award of punitive damages.

I respectfully dissent from the majority's decision to reverse the award of compensatory damages. I concur (with some reluctance) in the majority's judgment that the punitive damages award must be reversed.

## I.

Title VII does not protect workers against all forms of verbal and physical harassment in the workplace. It protects only against conduct that is (1) unwelcome, (2) because of sex, and (3) "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002) (internal quotation marks and citation omitted). In addition, a plaintiff who establishes that her work environment was abusive can only recover if there is some basis on which responsibility for the abusive environment can be imputed to her employer.

In reviewing the district court's denial of Scollon Productions's motion for judgment as a matter of law, the first question is how much of the conduct complained of by Ocheltree could be seen by a reasonable jury as "because of sex." Once the truly sex-based conduct has been identified, the second question is whether that conduct could be seen by a reasonable jury as sufficiently severe or pervasive to create an abusive work environment. My problem with the majority's analysis is its answer to the first question. I believe that a reasonable jury could identify a much greater amount of the alleged harassment as sex based than the majority would allow. Once the first question is answered properly, a reasonable jury could regard the sex-based conduct complained of by Ocheltree as sufficiently severe or pervasive to create an abusive work environment.

Because I believe that a more detailed and explicit account of the trial evidence is needed to determine how much of the conduct complained of by Ocheltree could reasonably be seen as sex based, I begin my analysis by supplementing the majority's account of the evidence concerning Ocheltree's work environment. Much of what I add is raw, but without it the evidence is not presented in the light most favorable to Ocheltree.

23

Lisa Ocheltree began working in the production shop at Scollon Productions in February 1994. She was the only female employee in the shop, working alongside "ten or eleven" men. J.A. 110. In contrast, at least twenty women were employed in the "sewing room production area." J.A. 312.[1] Ocheltree testified that the atmosphere in the production shop was "fun" and "friendly" when she first began to work there, but that over the course of the first year of her employment, sexual banter and sexual conduct of other sorts began to occur with increasing frequency. J.A. 111, 113. Her testimony was seconded by Brian Hodge, who started working in the production shop several months after Ocheltree began working there. Hodge testified that the atmosphere seemed okay to him initially but that over time the work environment became increasingly coarse. J.A. 199-200.[2] Ocheltree recounted several specific incidents of harassment, the three most prominent of which (the vulgar song, the oral-sex-on-the-mannequin incident, and the body-piercing book incident) are summarized by the majority.

The three incidents mentioned by the majority bear recounting here as part of the whole picture facing Ocheltree. On one occasion a male coworker went up to Ocheltree and sang the following song to her "like he was in the opera": "Come to me, oh, baby come to me, your breath smells like c[o]m[e] to me." J.A. 115. To Ocheltree's chagrin the men in the production shop expressed their enjoyment of the incident with much laughter. *Id.* On another occasion when Ocheltree

---

[1] The record does not indicate whether other women worked in the production shop either before or after the period when Ocheltree worked there.

[2] The majority points to uncontested evidence that the atmosphere in the production shop was essentially the same before Ocheltree began working there as it was at the beginning of her employment. *Ante* at 8. This is irrelevant. The crucial point is this: Ocheltree's evidence established that the behavior she complained of worsened at some point after her arrival, and it became still more objectionable in the wake of her complaints. This evidence supports Ocheltree's claim that the harassing behavior was targeted at her as the only female in the production shop, thus belying the majority's assertion that the jury heard uncontested evidence that Ocheltree "would have been exposed to the same atmosphere had she been male." *Ante* at 7.

24

arrived at work and proceeded to the time clock, two coworkers were positioned at a nearby mannequin. One was pinching the mannequin's nipples, and the other was on his knees simulating oral sex on the mannequin. Ocheltree said to the men, "You guys are disgusting. This needs to stop." As she turned to leave the room, she heard laughter in the background. J.A. 115-17. On the third occasion Ocheltree was seated at her work station, and some of her coworkers were looking at a book that contained pictures of men with pierced genitalia. One coworker took the book, approached Ocheltree, and opened the book to the centerfold photograph showing a man's crotch area. The scrotum was pierced with hoops, and there were chains running up to the top of the penis. The coworker, with his male colleagues looking on, said, "Lisa, what do you think about this?" Again, this generated laughter from the men in the shop. J.A. 117-18.

Ocheltree also presented evidence, not discussed by the majority, of other incidents that could reasonably be seen as sex-based harassment. Brian Hodge testified that some of the men who worked in the production shop would "often fondle" the mannequin as they walked by, J.A. 200, and that "anytime [Ocheltree] was walking by just about they would do something sexual to the mannequin in front of her just because they knew it bothered her," J.A. 202. In addition, Ocheltree testified that Ellery Locklear, vice president of Scollon Productions, berated her for using the phone to check in on her son, who was at home recovering after breaking his tail bone in two places. (Apparently, Ocheltree's call violated the company's telephone usage policy.) According to Ocheltree, Locklear told her, "I don't care if someone is dying in your family, you are not to be on the phone and you must be here at work." J.A. 129. Ocheltree claims that Locklear then said that if she did not like that rule, she ought to go home and be a housewife because she was not cut out for her work at Scollon Productions. *Id.* A jury could reasonably see this as another piece of evidence suggesting that Ocheltree experienced harassment because of her sex. *Cf. Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (characterizing question to plaintiff about "whether she would be a `mini van driving mommy' or `be a salesperson and play with the big boys'" and statement that the plaintiff should "`go home

25

and fetch [her] husband's slippers like a good little wife'" as "logically attributable" to the plaintiff's gender).[3]

Then there is the matter of the sexual banter that Ocheltree claims occurred on a daily basis. The majority describes this banter in only the most general terms, but the majority's reticence blunts the force of Ocheltree's case. I will therefore present, in the light most favorable to Ocheltree, an account of the running sexual commentary in the production shop.

Ocheltree presented evidence of several different kinds of inappropriate and unprofessional sexual remarks in her workplace that she views as evidence of sex-based harassment. One category is simply the extensive use of profanity, with many of the words sexually tinged: motherfucker, fuck, faggot, dickhead, pussy, ass, and the like. A second category involves Ocheltree's male coworkers' use of explicitly sexual insults to needle each other. For example, Ocheltree testified that "[g]uys would make hand gestures down at their private parts and tell other guys to suck it." J.A. 113. Coworkers sometimes suggested that various male employees were involved in homosexual relationships and that one employee was having sex with a dog. A third category, and the one that strikes me as most significant, is Ocheltree's evidence that her coworkers constantly discussed their sexual exploits with their wives and girlfriends in extremely graphic terms. Ocheltree testified that her coworkers would regularly talk about their sexual experiences of the night before "as to that she swallowed, she gave good head, that I fucked her all night long," etc. J.A. 118. One employee related that his girlfriend "gave good head and that she likes to swallow, that she liked it from behind, that she would do it anywhere with him." J.A. 120. He further said that she "could

---

[3] The majority criticizes my reliance on this incident on the ground that the special interrogatories submitted to the jury were limited to questions about the conduct of Harold Hirsch, the shop supervisor, and Ocheltree's coworkers. *Ante* at 7-8 n.3. Yet Locklear was the vice-president of the company, and his actions are relevant to the ultimate question of whether Scollon Productions can be held liable to Ocheltree for the creation of a hostile work environment. *See Andrade v. Mayfair Mgmt., Inc.*, 88 F.3d 258, 261 (4th Cir. 1996) (stating that harassing behavior by a corporate officer will be deemed that of the employer).

26

suck a golf [ball] through a garden hose." J.A. 120. In his testimony, Brian Hodge recounted how one of the employees in the production area often "would speak of [his wife] sucking his dick and swallowing and letting it run down the side of her face and stuff." J.A. 200. Ocheltree testified that she heard remarks along these lines "every day." J.A. 120. Hodge also testified that he heard such remarks on a daily basis. J.A. 204. Finally, Ocheltree testified that on one occasion, shop supervisor Harold Hirsch said that he was interested in and enjoyed having sex with young boys and that Hirsch's comments were "purposefully said in front of [her] because [Hirsch and two other production shop employees] enjoyed looking at [her] and seeing [her] reaction." J.A. 119.

Having set out more fully the evidence concerning Ocheltree's workplace environment in the light most favorable to her, I turn to the question of whether and to what extent the objectionable conduct was sex based. Under the Supreme Court's *Oncale* decision the proper question is "`whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The majority acknowledges, at least for the sake of argument, that a reasonable jury could regard the vulgar song and the incident involving simulated oral sex on the mannequin as sex based because they could be seen as "particularly demeaning towards women or as veiled sexual propositions." *Ante* at 11. It then reasonably concludes that two incidents over the space of eighteen months are insufficient as a matter of law to constitute an abusive work environment. I suspect that the majority would hold that even if a reasonable jury could regard the body-piercing book incident, the various mannequin fondling incidents described by Hodge, and Locklear's comment that Ocheltree should go home and be a housewife as sex based, the sum total of these incidents would still be insufficiently severe or pervasive as a matter of law. Though I have my doubts about that conclusion, I am willing to accept it for purposes of argument. To my mind, the majority's primary mistake is its conclusion that a reasonable jury could not regard *any* of the day-to-day sexual banter complained of by Ocheltree as sex based. The majority offers several reasons for this conclusion. First, it portrays Ocheltree as a mere bystander to discussions between the men

27

in the production shop and claims that the same kind of talk would have occurred regardless of Ocheltree's presence there. In addition, it argues that even if some of the sexual banter was a reaction to Ocheltree's presence in the workplace or her complaints, the alleged harassment was still not sex based because "even if the alleged harassers were intending to bother Ocheltree, there is no evidence that those participating in the offensive conduct were attempting to bother her *because of her gender*." *Ante* at 10. The majority also observes that even though the banter was "sexually explicit" and "generally degrading, humiliating, and even insulting," it was not "aimed solely at females in any way." *Ante* at 9. I find these reasons unconvincing.

In my view, there are two ways in which a reasonable jury could find that much of the sexual banter complained of by Ocheltree satisfied the "because of sex" prong. First, a reasonable jury could find that much of the banter was "directed at" Ocheltree in the sense that it was intentionally said in her presence in order to make her uncomfortable and self-conscious about her status as the only woman in the production shop. Second, a reasonable jury could find that even if very few of the sexual remarks were made in response to Ocheltree's presence in the production shop, her male coworkers' relentless, graphic descriptions of their sex lives count as sex-based harassment because they portray women as sexually subordinate to men. Ocheltree's coworkers made her uncomplaining submission to an atmosphere suffused with degrading images of female sexuality an implicit condition of her employment, and this harassment was "because of sex" in the sense that it made the workplace more hostile to Ocheltree precisely because she was a woman.

### A.

As to my first point, Ocheltree concedes that most of the offensive conduct was not aimed exclusively at her. Instead, she claims that her coworkers knowingly made sexual remarks and engaged in other behavior with a sexual content in her presence with the intention of making her uncomfortable. Ocheltree presented the following evidence in support of this theory. Ocheltree and Hodge both testified that Ocheltree's coworkers enjoyed offending her and laughing at her reactions. When asked whether the incident involving simulated oral sex on the mannequin was intended to provoke a reaction from her,

28

Ocheltree testified: "Why else would two guys be doing that at the time when I was supposed to be in there going to work . . . and then whenever I say all this is disgusting and everyone laughs, who would it be directed to? I was the only female there." J.A. 117. She also testified regarding Hirsch's remark about having sex with little boys that "[i]t was purposefully said in front of me because they enjoyed looking at me and seeing my reaction." J.A. 119. Brian Hodge testified that "[a]nytime [Ocheltree] was walking by just about they would do something sexual to the mannequin in front of her just because they knew it bothered her." J.A. 202. In addition, both Ocheltree and Hodge testified that sexual talk and conduct in the production area first became a problem after Ocheltree began working at Scollon Productions. Hodge further testified that the amount of sexual conduct and talk escalated considerably after Ocheltree complained about it at a safety meeting for production shop employees. J.A. 202-03. A reasonable jury could infer from this evidence that a considerable amount of the sexual talk and behavior in the production shop was intended, at least in part, to make Ocheltree uncomfortable and to provoke reactions from her.[4]

The majority also suggests that even if Ocheltree's coworkers intended to bother her, "there is no evidence that those participating in the offensive conduct were attempting to bother her *because of her gender*." *Ante* at 10. The majority does not elaborate, but I take its argument to be that Ocheltree's evidence could at most show that she

---

[4] The majority understates the evidence that the harassing behavior was intended to bother Ocheltree by mentioning only Hodge's testimony that Ocheltree's coworkers would "do something sexual to the mannequin" whenever Ocheltree walked by "just because they knew it bothered her." J.A. 202. The majority then dismisses this testimony because Hodge stated that he was only speculating about the motives behind the mannequin incidents. The majority places more weight on Hodge's characterization than it will bear. A reasonable jury could conclude that by characterizing his testimony as "speculation," Hodge simply acknowledged that he was making an inference when he said that Ocheltree's coworkers fondled the mannequin in order to bother her. Evidence in the form of inferences about the motives of other people is a common feature of Title VII cases, and there is nothing problematic about Hodge's testimony in this regard. *See, e.g.*, *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001).

29

was harassed not because she was a woman, but simply because she was offended by and objected to working in an environment saturated with sexually explicit remarks. *Cf. Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 751 (4th Cir. 1996) ("Title VII does not reach discrimination based on . . . [an employee's] sexual behavior, prudery, or vulnerability."). Perhaps the majority is correct to suggest that Ocheltree's argument fails if her coworkers harassed every employee — male or female — who was offended by or objected to the sexual talk and antics in the production shop. Such proof would suggest that Ocheltree was targeted not because of her sex, but simply because of her "prudery," her sensitivity to the sexual remarks.[5] The question, though, is how much proof Ocheltree has to produce before a reasonable jury could conclude that she was harassed because she was a prude *and a woman*, not simply because she was a prude. Here, Ocheltree was the only woman in a working environment with ten or eleven males who engaged in sexual talk and behavior in order to make her uncomfortable. Further, the majority observes that men sometimes complained about the sexual tenor of the workplace, but the jury heard no evidence that any conduct subsequent to these complaints was intended to bother the complaining men. Nor was there evidence that their objections or reactions were the subject of derisive laughter in the way that Ocheltree's were. In light of these points, I think a reasonable jury could see the harassment as rooted in male resentment of Ocheltree's intrusion into "their" workplace and in resentment of her demands that they clean up their act. *Cf.* Kathryn Abrams, *The New Jurisprudence of Sexual Harassment*, 83 Cornell L. Rev. 1169, 1211 (1998) (observing that when women enter a predominantly male workplace, male workers often seek to reaffirm the dominance of masculine norms in the workplace by "engag[ing] more intensely . . . in talk that sexualizes or derogates women"). In other words, a reasonable jury could conclude that Ocheltree was harassed not simply because she found the sexual behavior in the workplace offensive, but because she was a woman who found that behavior offensive. In sum, I believe a reasonable jury could conclude that

---

[5] I note that the word "prudery" seems misplaced here. Prudery connotes an artificially refined sense of delicacy about sexual matters. A person would hardly need to be prudish to find the atmosphere in Ocheltree's workplace offensive.

much of the sexual banter in Ocheltree's workplace was directed at her because of her sex.

## B.

What I have just said in part I.A is sufficient by itself to support the affirmance of Ocheltree's compensatory damages award. There is, however, another reason why a reasonable jury could conclude that a large part of the sexual banter in the workplace satisfied the "because of sex" prong. A reasonable jury could find that the content of much of the banter was "particularly demeaning towards women," *ante* at 11, and therefore made Ocheltree's working environment more hostile to her as a woman, regardless of whether the banter was intended to bother her or was directed at her in any other way. This means that even if I agreed with the majority that a reasonable jury would have to find that Ocheltree was a mere bystander to the sexual remarks in her workplace, I would still conclude that many of the remarks could reasonably be seen as satisfying the "because of sex" prong.

Title VII's because-of-sex requirement is most obviously satisfied in two common scenarios: when the plaintiff is the object of unwanted sexual advances, *see, e.g.*, *Harris v. L & L Wings, Inc.*, 132 F.3d 978 (4th Cir. 1997), and when the plaintiff is the target of open hostility because of her (or his) sex, *see, e.g.*, *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000). We have never held, however, that these two scenarios exhaust the field of sex-based harassment. Courts have also recognized that harassing conduct can be "because of sex" even when the conduct "is not directed at a particular individual or group of individuals, but is disproportionately more offensive or demeaning to one sex." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991). *See also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990) (stating that "we do not consider it an unfair burden of an employer of both genders to take measures to prevent an atmosphere of sexism . . . [from pervading] the workplace"). This category of sex-based harassment "describes behavior that creates a barrier to the progress of women in the workplace because it conveys the message that they do not belong, that they are welcome in the workplace only if they will subvert their identities to the sexual stereotypes prevalent in that

31

environment. That Title VII outlaws such conduct is beyond perad-venture." *Robinson*, 760 F. Supp. at 1523. In *Robinson* the court held that a workplace plastered with pictures of nude and partially nude women (often in sexually submissive postures) was a hostile environ-ment even though the posting of the pictures "did not originate with the intent of offending women in the workplace (because no women worked in the jobs when the behavior began)." *Id.* It was enough that the pictures had a "disproportionately demeaning impact on the women now working" in the same environment. *Id.*

*Robinson* and *Andrews* suggest that the majority is too quick to conclude that none of the sexual banter in the workplace constitutes sex-based harassment because Ocheltree "would have been exposed to the same atmosphere had she been male." *Ante* at 7. Even if true, the majority's point would still leave the question of "whether mem-bers of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring). In other words, there would still be a question of whether Ocheltree's environment was more hostile to her because of her sex than it would have been to a man.

Although our circuit has not yet decided a case using reasoning similar to that in *Robinson* and *Andrews*, such reasoning is a logical extension of well-established Title VII principles. Consider, for exam-ple, a traditionally all-male workplace in which women are routinely referred to as "bitches," "whores," and "cunts." Surely it is uncon-troversial that a woman employee subjected to that environment would have a claim for sex-based harassment even if the employer could establish that the male workers would have spoken the same way regardless of her presence and even if the offensive words were never said directly to her. The reason is that such "unambiguous gen-der epithets," *ante* at 10, signal hostility to the presence of women in the workplace and create an atmosphere that is inhospitable to women because of their sex. Whether or not plastering pornographic and quasi-pornographic pictures on the wall can be said to display outright hostility toward women in the workplace, it can certainly be said to evince and to perpetuate attitudes that make the workplace hostile to women because of their sex:

32

> Pornography on an employer's wall or desk communicates a message about the way he views women, a view strikingly at odds with the way women wish to be viewed in the workplace. Depending upon the material in question, it may communicate that women should be the objects of sexual aggression, that they are submissive slaves to male desires, or that their most salient and desirable attributes are sexual. Any of these images may communicate to male coworkers that it is acceptable to view women in a predominantly sexual way. All of the views to some extent detract from the image most women in the workplace would like to project: that of the professional, credible coworker.

*Robinson*, 760 F. Supp. at 1526 (quoting Kathryn Abrams, *Gender Discrimination and the Transformation of Workplace Norms*, 42 Vand. L. Rev. 1183, 1212 n.118 (1989)). *See also Andrews*, 895 F.2d at 1485-86 ("Obscene language and pornography quite possibly could be regarded as highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse" (internal quotation and citation omitted)). If use of unambiguous gender epithets can constitute sex-based harassment because it creates a workplace atmosphere suffused with hostility to women, there is no principled reason why a workplace suffused with depictions of women as sexual objects could not also constitute sex-based harassment. Thus, I conclude that a workplace environment could be abusive "because of" a plaintiff's sex even if the environment was essentially the same both before and after the plaintiff entered the workplace. Further, I can see no reason why the reasoning of *Robinson* and *Andrews* should be limited to sexually explicit *photographs* of women in the workplace. Sexual banter in the workplace that is the aural equivalent of pornography should surely be just as actionable as pornographic images. Here, the question is whether a reasonable jury could conclude that any of the sexual banter in Ocheltree's workplace was so disproportionately demeaning to women that it should count as harassment "because of sex." This question can only be answered by considering the content and context of the banter in question.

Although my reasoning is different, I agree with the majority that much of the sexual talk Ocheltree heard — vulgar though it may be

33

— cannot be seen as disproportionately demeaning to women. Frequent use of such words as "fuck," "dickhead," and "ass" may be unprofessional and offensive, but I cannot say that a working environment permeated by such language is more offensive to women because of their sex than it is to men. Similarly, frequent exchanges of mock homosexual taunting (for example, male coworkers pointing to their genitals and telling other males to "suck it," J.A. 113) would be distasteful to most women (and, I believe, to most men), but they would not necessarily make the work environment more hostile to women because of their sex.[6] Ocheltree's coworkers' constant descriptions of their sexual exploits, including their near-obsessive interest in discussions of oral sex, are another matter altogether. Obviously, discussions of sexual matters (including discussions of oral sex) are not *automatically* demeaning to women. *See* Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1795 (1998) (citing research suggesting that "where men and women work alongside each other in balanced numbers . . . . sexual talk and joking occurs with frequency, but is not experienced as harassment"). But the tone of the discussions in the production shop was hardly one of mutuality and respect. *See supra* at 26 (recounting daily remarks by Ocheltree's coworkers along the lines of "she gave good head," "she likes to swallow," "she likes it from behind," etc.). Comments like these portray women as sexually subordinate to men; indeed, it is not too strong to say that the overall tenor of the workplace banter conveyed the message that women exist primarily to gratify male desires for oral sex. A reasonable woman would find this message offensive, to say the least. Further, the comments were far too graphic and frequent to be dismissed as "occasional vulgar banter, tinged with sexual innuendo." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (internal quotation marks and citation omitted). Instead, they are instances of sexual harassment because they express and reinforce a regime of gender hierarchy in which men are portrayed as sexual subjects while women are portrayed as sexual objects. *See generally* Abrams, *The New Jurisprudence*, *supra* at 1205-25; Katherine M. Franke, *What's Wrong with Sexual Harassment?*, 49 Stanford L.

---

[6] I would add, however, that such language could be sex-based harassment in the proper context — if, for example, it was used as part of a general campaign to create a sexually explicit atmosphere in the workplace in order to drive out women employees.

34

Rev. 691, 762-72 (1997). It is true, as Scollon Productions points out, that Ocheltree's coworkers did not proposition her or speculate about her sexual habits. But this is hardly dispositive. *See, e.g.*, *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (stating that "offensive comments need not be directed at a plaintiff in order to constitute conduct violating Title VII"). When a workplace is suffused with representations of women as sexual objects, a woman in that workplace would doubtless wonder whether the primary questions about her in the minds of her coworkers involved such matters as whether she "swallows" or whether she could "suck a golf ball through a garden hose." The demeaning portrayals of women as sexual objects in Ocheltree's workplace constituted sex-based harassment because they made the working environment more hostile to Ocheltree than to her coworkers precisely because she was a woman. That is enough to satisfy Title VII's "because of sex" prong, for the "critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring).

I would hold, then, that a reasonable jury could conclude that the pervasive workplace comments depicting women as sexually subordinate to men constitute harassment "because of sex." These comments are indistinguishable in principle from the harassment discussed in *Robinson* because they are "disproportionately. . . offensive or demeaning to one sex." *Robinson*, 760 F. Supp. at 1522-23.

### C.

The majority mounts a strident attack on this last conclusion, and the attack boils down to three basic arguments. First, the majority argues that my position is incompatible with Supreme Court and circuit precedent regarding the "because of sex" requirement. Second, the majority asserts that my arguments depend on the untenable proposition that all sexual comments in the workplace are "disproportionately demeaning to women." Third, the majority argues that under our decision in *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255 (4th Cir. 2001), Ocheltree did not experience sex-based harassment because the production shop environment was also offensive to men. I will address each argument in turn.

35

First, according to the majority, it is well established that harassing conduct can only be "because of sex" if the plaintiff's gender is the "but for" cause of the harassment or the harassment is motivated by the plaintiff's gender. The majority therefore concludes that the comments and conduct on which I rely cannot constitute harassment "because of sex" because "Ocheltree would have been exposed to the same atmosphere had she been male." *Ante* at 7. I acknowledge that courts regularly explain the "because of sex" requirement by using the formulations favored by the majority, and in many contexts these formulations are helpful analytically. I believe, however, that the "because of sex" requirement allows for more interpretive flexibility than the majority recognizes. *Cf.* David S. Schwartz, *When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. Pa. L. Rev. 1697, 1781 (2002) (suggesting that "`because of' does not necessarily mean `motivated by'"). Indeed, I believe this flexibility is inherent in *Oncale*'s formulation of the "because of sex" requirement as turning on the question of "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). As the majority would no doubt observe, there is a sense in which both male and female workers were exposed to the same environment at Scollon Productions because the explicit discussions of oral sex and similar matters were heard by both Ocheltree and her male coworkers. Yet there is an equally obvious sense in which women in an atmosphere saturated with remarks demeaning to women are "exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed" precisely because the language heard by both women and men is more demeaning to women than to men. It is this understanding that I rely upon in suggesting that the workplace comments portraying women as sexually subordinate to men qualify as harassment "because of sex."

By reasoning that harassment cannot be "because of sex" if the plaintiff "would have been exposed to the same atmosphere had she been male," the majority appears to commit this court to a course that is clearly wrong. Suppose, for example, that an African-American plaintiff brings a race discrimination claim alleging a hostile work environment due to his coworkers' daily use of the meanest racial slur against African-Americans. Suppose further that the workplace had

36

previously been all white and that the pattern of racial slurs was the same both before and after the plaintiff's arrival. The majority's reasoning suggests that if the employer could show that none of the racial slurs were directed at the plaintiff and that he would have been exposed to exactly the same language if he had been white, the harassment in this example could not be "because of race." Yet I find it difficult to believe that any court would fail to find race-based harassment on these facts. If the right to be free from a racially hostile work environment means anything at all, surely it includes the right to be free from a workplace environment permeated by racial slurs. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) ("Evidence of a general work atmosphere therefore — as well as evidence of specific hostility directed toward the plaintiff — is an important factor in evaluating [a hostile environment] claim." (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987))). I do not see how *Oncale* could compel a different conclusion. My explanation for this is simple: the plaintiff in my example suffers discrimination "because of race" because he is exposed to disadvantageous conditions of employment to which his white coworkers are not exposed. The workplace is therefore more hostile to him precisely because he is black. My example shows, I believe, that harassment can be "because of race" even if the plaintiff would have been exposed to the same atmosphere had he been white. If this is true, harassment can also be "because of sex" even if the plaintiff would have been exposed to the same atmosphere had she been male.

In further support of its first argument, the majority makes the interesting suggestion that my approach to the "because of sex" requirement wrongly attempts to apply disparate impact models of proof to sexual harassment claims. It is important to see why this is not so. As Professor Schwartz points out, disparate impact theory is designed to address "facially neutral employment practices that have a disparate impact (such as testing instruments or height-weight requirements) but that might be defensible under some degree of business necessity." *Schwartz*, *supra* at 1773. Workplace conversations depicting women as sexually subordinate to men, on the other hand, are not facially neutral and they have no business justification. When women are characterized in this way, it is wrong to suggest that offense to women in the workplace is a "potential unintended effects" of the characterizations. *Ante* at 13. Instead, such characterizations

37

constitute sexual harassment because they convey the message that women are, and should be, subordinate to men.

The majority's second argument is that under my proposed definition of sex-based harassment, any discussion of sex in the workplace constitutes sexual harassment because such discussions are necessarily more demeaning to women than to men. *See ante* at 16 (stating that my reasoning would mean that "conversations between males about their heterosexual activities in the presence of a female virtually always constitute sex-based harassment because, according to [my] characterization, these conversations depict women as `sexually subordinate to men'"); *ante* at 17 n.12 (stating that I propose "a rule whereby a reviewing court would affirm a finding of gender-based discrimination once a certain number of conversations about heterosexual behavior occur in the workplace in the presence of a female"). The majority observes that the rule it attributes to me would stand in some tension with the Supreme Court's observation in *Oncale* that it has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. Further, the majority implies that I am ignorant of the "feminist literature" suggesting that "working women can be, and usually are, as comfortable as are men with sexually explicit conduct and conversations." *Ante* at 18. Indeed, my views are "paternalistic," *ante* at 18 and 20, rely on "outdated stereotypes," *ante* at 18, and attempt to transform Title VII into a "neo-Victorian chivalry code designed to protect what [I] imagine[ ] to be the tender sensitivities of contemporary women," *ante* at 20. *See also ante* at 17 n.12 (stating that under my approach "Title VII would become a workplace code for `gentlemanly conduct' in the presence of women").

My first response to all of this upbraiding is that if I actually held the views attributed to me by the majority, the substance of its criticisms would be largely justified. It would, of course, be absurd for me to contend that all discussions of sex — regardless of their specific content — are automatically degrading and offensive to women. I am well aware of feminist criticisms of the idea that sex equals sexism in the workplace. *See, e.g.*, *Franke*, *supra* at 714-25. To make the point once more, I do not claim that all discussions of sexual matters in the workplace are automatically demeaning to women or that work-

38

place sexual discussions are always more offensive to women than to men. Instead, I claim that Ocheltree's coworkers' constant, graphic descriptions of oral sex and other sexual practices could be seen by a reasonable jury as sex-based harassment because they portray women as sexually subordinate to men and thereby serve to perpetuate gender hierarchies in the workplace. It is the specific content of these descriptions ("she gave good head," "she swallows," etc.), and not simply their sexual nature, that qualifies them as harassment "because of sex." This is one of the reasons why I have found it necessary to set out Ocheltree's evidence about the atmosphere in the production shop in explicit detail.[7] In short, the majority's second argument simply attacks a straw man.[8]

The majority's third argument is that under our decision in *Lack*, Ocheltree's sexual harassment claim must fail because some men complained about the work environment in the production shop. *See ante* at 9 (quoting *Lack*'s statement that the plaintiff's claim was "undercut[ ] . . . to a substantial extent" by the "fact that female employees . . . lodged similar complaints" against the male plaintiff's

---

[7] In further response to the majority's charge that I have relied "upon the shock value of the salacious conduct" of Ocheltree's coworkers, *ante* at 12, I would add this: if we are going to overturn a jury verdict that so strongly favored Ocheltree, we ought at least to present the evidence in a way that gives some insight into why the jury might have reached the conclusions it did.

[8] I also add two comments about the majority's efforts to tag me as paternalistic and neo-Victorian. First, if one of the majority's goals is to avoid paternalism in the Title VII field, that goal would be better served by focusing on whether the sexual talk was welcome or unwelcome than by adopting an unduly narrow reading of the "because of sex" requirement. *Cf.* Schwartz, *supra* at 1756-58. Second, if there is anything neo-Victorian lurking in the opinions released today, it is the majority's suggestion that Ocheltree's claim should fail because "the offensive conduct [here] took place in a costume production shop where public access is controlled, not a church office, retail shop, bank, or professional office." *Ante* at 17. In other words, women in blue collar jobs must put up with conduct that women who work in banks or professional offices need not tolerate. *Cf. Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) ("Surely women working in the trades do not deserve less protection from the law than women working in a courthouse.").

39

supervisor).[9] *Lack* should not be read as broadly as the majority suggests. The statement the majority takes from *Lack* was made in the context of examining whether the male plaintiff had offered direct comparative evidence about how his alleged harasser (a male supervisor) treated both men and women in the workplace. *See Lack*, 240 F.3d at 262; *cf. Oncale*, 523 U.S. at 80-81 (observing that harassing conduct that would not otherwise qualify as sex based can be shown to constitute discrimination "because of sex" through the use of "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace"). My argument here does not rely on comparative evidence. Instead, I am claiming that workplace comments portraying women as sexually subordinate to men satisfy the "because of sex" requirement because they express and reinforce gender hierarchy in the workplace. Such comments are, in this respect, analogous to *Oncale*'s "sex-specific and derogatory terms" that signal "hostility to the presence of women in the workplace." *Oncale*, 523 U.S. at 80. If this theory is correct — and I recognize, of course, that the majority rejects it — I do not see how Ocheltree's claims can be defeated simply by observing that some men at Scollon Productions also complained about the sexual conduct in the production area.[10] The Second Circuit has explained that harassment of a woman can be sex based if she is "abused in ways that cannot be explained without reference to her sex, notwithstanding the fact that a man received treatment at least as harsh, though for other — non-sexual — reasons." *See Brown*, 257 F.3d at 254. Along the

---

[9] The majority claims that Ocheltree "conceded that the [sexual] conduct [in the production shop] was equally offensive both to men and women." *Ante* at 9. I do not believe the record supports this characterization. So far as I can tell, Ocheltree simply acknowledged that some of her male coworkers also voiced some complaints about sexual conduct in the production shop. This does not amount to a concession that men were equally offended. *Cf. Brown v. Henderson*, 257 F.3d 246, 254 (2nd Cir. 2001) (stating that discrimination can be sex based if "a co-worker or supervisor treats both men and women badly, but women worse").

[10] The majority is not specific about the subject of the men's complaints, but I assume the majority's point is that some men in the production shop were offended by taunting from male coworkers that included explicit or implicit references to homosexuality (men pointing to their genitals and telling other men to "suck it," etc.).

40

same lines, our analysis in *Lack* seems to indicate that the sexual conduct complained of by some of Ocheltree's male coworkers here would not constitute harassment of them "because of sex." *See Lack*, 240 F.3d at 261 n.8 (noting that "when expressions such as `fuck me' . . . are used by men speaking to other men, often `their use has no connection whatsoever with the sexual acts to which they make reference'" (quoting *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997))). It follows that if I am right in my basic contention that the workplace comments depicting women as sexually subordinate to men could be regarded by a reasonable jury as discrimination "because of sex," the fact that some male coworkers were also offended by the comments does not undermine Ocheltree's case.

D.

Because I would hold that much of the sexual discussion in Ocheltree's workplace constituted sex-based harassment, my approach to the "severe or pervasive" prong of the hostile environment analysis is quite different than the majority's. For me, the proper question is whether a reasonable jury could find that, taken together, the vulgar song, the various mannequin incidents, and the workplace banter involving degrading descriptions of female sexuality were sufficiently severe or pervasive to alter the conditions of Ocheltree's employment and to create an abusive work environment. There is no question that Ocheltree subjectively perceived the production shop environment as hostile. In deciding whether a jury could also reasonably conclude that the environment was objectively hostile (hostile to "a reasonable person in the plaintiff's position," *Oncale*, 523 U.S. at 82), we are required to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The Supreme Court has emphasized that an abusive work environment need not "lead[ ] to a nervous breakdown." *Id.* at 22. It is enough if the environment "detract[s] from employees' job performance, discourage[s] employees from remaining on the job, or keep[s] them from advancing in their careers." *Id.* Applying these standards here, I readily conclude that a reasonable jury that fully credited Ocheltree's evidence could find that a reasonable person in her circumstances would experience the work environ-

41

ment as abusive. Ocheltree and Hodge both testified that the explicit and degrading discussions of oral sex and related matters took place on a daily basis. While the relentless sexual remarks were not physically threatening, they were humiliating to women generally and highly offensive to Ocheltree. They surely made it more difficult for her to do her job.

### E.

My primary objection to the majority opinion is that it has turned the "because of sex" requirement into an obstacle where it had not been an obstacle before, thereby making it more difficult to establish a sexual harassment claim. I have an additional point, however. There appears to be a profound difference in our respective approaches to reviewing a jury verdict. Again and again, the majority characterizes the evidence in a light more favorable to Scollon Productions than to Ocheltree. This reaches its apex when the majority suggests that there is "substantial evidence" that Ocheltree's own offensive conduct contributed to the coarse atmosphere in the production shop. *See ante* at 19-20. Ocheltree specifically denied the vulgar activity attributed to her by the majority, J.A. 147-48, and the jury believed her. Indeed, it appears that the jury believed virtually everything that Ocheltree and her witnesses said and dismissed the testimony of Scollon Productions' witnesses as unworthy of belief. That was the jury's prerogative, and we are bound to respect it.

* * *

For all of these reasons, I respectfully dissent from the majority's holding that the evidence presented at trial was insufficient to support the jury's decision that Ocheltree was subjected to a hostile environment because of her sex.

### II.

This conclusion makes it necessary for me to indicate, albeit briefly, how I would resolve the questions in this case that the majority has no need to reach. On the question of whether liability for the hostile work environment could be properly imputed to Scollon Pro-

42

ductions, I conclude that a reasonable jury could find that the company had constructive knowledge of the harassment because it failed to establish adequate procedures for receiving sexual harassment complaints. Accordingly, I would affirm the jury's modest award of compensatory damages to Ocheltree. I concur in the majority's judgment reversing the award of punitive damages because Ocheltree failed to produce evidence that would allow a reasonable jury to conclude that any Scollon Productions employee "discriminated in the face of a known risk that his conduct [would] violate federal law." *Anderson*, 281 F.3d at 460.

43